Case 4:22-cr-00129   Document 1   Filed on 03/03/22 in TXSD   Page 1 of 10

United States Courts
Southern District of Texas
FILED

*March 03, 2022*

Nathan Ochsner, Clerk of Court

**Sealed**
Public and unofficial staff access to this instrument are prohibited by court order

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § § | |
| v. § § | Criminal No. **4:22cr129** _____ |
| BOLA STEPHEN, § § | UNDER SEAL |
| Defendant. § § § | |

### INDICTMENT

The Grand Jury charges:

### General Allegations

At all times material to this Indictment, unless otherwise specified:

### The Medicare Program

1. Medicare was a federal health care program that provided benefits to persons who were 65 years old or older or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"). Individuals who received Medicare benefits were referred to as Medicare "beneficiaries." Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

2. Medicare had four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part A covered eligible home health care services provided by a participating home health agency ("HHA") to Medicare beneficiaries who were confined to their homes and had a medical need for skilled nursing care, physical therapy, speech therapy, or an ongoing need for occupational therapy. Medicare Part B covered the cost of physicians' services, outpatient care, and other ancillary

1

services not covered by Part A. Claims for qualifying home health care services were typically reimbursed in full to the HHA based on contract rates determined by Medicare.

3. Health care providers that provided services to Medicare beneficiaries were required to apply for and obtain a "provider number." Part of this application process required the health care providers to certify that they understood and would abide by the federal laws and regulations governing their participation in Medicare, including a specific understanding of the Federal anti-kickback statute, 42 U.S.C. § 1320a-7(b).

4. A health care provider that received a Medicare provider number could file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider that ordered the services.

5. Since October 2000, Medicare compensation to home health care agencies has been based on the Prospective Payment System ("PPS"). Under this system, Medicare paid an HHA a base payment, which was adjusted based on the severity of the beneficiary's health condition and care needs. The PPS payment provided HHAs with payments for each 60-day episode of care for each beneficiary. If the beneficiary was still eligible for home health care after a home health episode, they could be recertified for another 60-day home health episode. There was no limit to the number of home health episodes that a beneficiary could receive, so long as the beneficiary remained eligible for home health services.

6. According to Title 42, Code of Federal Regulations ("C.F.R."), Section 409.42, for home health services to be covered and therefore compensable by Medicare, all the following

eligibility requirements had to be met:

    a. The beneficiary had to be confined to the home or an institution that was not a hospital (i.e., homebound);

    b. The beneficiary had to be under the care of a physician who established the plan of care;

    c. The beneficiary had to need skilled services such as intermittent skilled nursing services, physical therapy, speech-language pathology services, or continuing occupational therapy services;

    d. The beneficiary had to be under a plan of care that met the requirements specified in 42 C.F.R. § 409.43; and

    e. The home health services had to be provided by, or under arrangements made by, a participating HHA.

7. Medicare Part A and Part B only paid for home health services if a physician or other allowed provider certified that the beneficiary was "confined to the home." 42 C.F.R. § 424.22. The law defined "confined to the home" as a situation where a beneficiary did not have a normal ability to leave the home without considerable and taxing effort. 42 U.S.C. § 1395n(a).

8. To determine the proper level of care for a beneficiary and ultimately to help determine the amount of payment the provider would receive, Medicare required that HHAs perform a beneficiary-specific, comprehensive assessment that accurately reflected the beneficiary's current health and provided information to measure the beneficiary's progress. In making this assessment, HHAs were required to use a tool called the Outcome and Assessment Information Set ("OASIS") form.

9. With limited exceptions, the OASIS form had to be completed by a registered nurse.

The standard OASIS form was detailed and comprehensive and covered, among other things, the beneficiary's medical history, living arrangements, separate assessments of every area of the body, mental and psychological status, and functional limitations. The OASIS form also allowed for a written analysis of findings; a projection of the number and type of treatments needed; and a description of goals, rehabilitation potential, and discharge plans for the beneficiary.

10. The OASIS form was then used to create a Plan of Care ("Form 485"). The Plan of Care specified the frequency of home visits and described the services to be provided to the beneficiary. The beneficiary's physician had to sign the Form 485, certifying that the beneficiary was confined to the home and needed intermittent skilled care. Further, the physician certified that the physician was caring for the beneficiary and that the services set forth on the Plan of Care were authorized by the physician.

11. Following the initial assessment, and based upon either completion of the Form 485 or a verbal order from the doctor (later confirmed by a signed Form 485), nurses, physical therapists, and/or other home health professionals visited the beneficiary based on the frequency ordered by the doctor and recorded the visit in progress notes.

12. Medicare Part A regulations required HHAs providing services to Medicare beneficiaries to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their beneficiaries, as well as records documenting actual treatment of the beneficiaries to whom services were provided and for whom claims for reimbursement were submitted by the home health agency. When they filled out Medicare enrollment applications, providers had to identify all locations where beneficiary records would be kept. These medical records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the HHA. Among the written records required to

be maintained were:

    a. the Plan of Care, which included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/rehabilitation potential, functional limitations/activities permitted, medications/treatments/nutritional requirements, safety measures/discharge plans, goals, and physician signature;

    b. the OASIS form;

    c. a signed certification statement by an attending physician that certified that the beneficiary was under the physician's care, was confined to his or her home, and needed the planned home health services; and

    d. medical records of each visit made by a nurse, therapist, or home health aide to a beneficiary, that described, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the beneficiary, any teaching and the understanding of the beneficiary, and any changes in the beneficiary's physical or emotional condition.

### The Relevant Entities, Defendant, and Relevant Individuals

13. Starlite Health Care Inc ("Starlite") was a Texas corporation doing business at 6514 Canyon Chase Drive, Richmond, TX 77469. Starlite was an HHA and submitted claims to Medicare for home health services.

14. Libertycare, Inc. ("Libertycare") was a Texas corporation doing business at 710 South 8th Street, Richmond, TX 77469. Libertycare was an HHA and submitted claims to Medicare for home health services.

15. Mercris Home Health Inc ("Mercris") was a Texas corporation doing business at 15322 Mira Vista Drive, Houston, TX 77083. Mercris was an HHA and submitted claims to

Medicare for home health services.

16. Milten Clinic, Inc. ("Milten") was a purported medical clinic doing business in and around Houston, Texas, that sold fraudulently signed Form 485s.

17. Defendant **BOLA STEPHEN** was a resident of Richmond, Texas, and was the owner and administrator of Starlite, and the administrator and beneficial owner of Libertycare and Mercris (collectively, "**BOLA STEPHEN's** HHAs").

18. Person 1 was the former owner of Mercris.

19. Person 2 was an acquaintance of **BOLA STEPHEN** and the nominee owner of Mercris. Although Person 2 agreed to be listed as the owner of Mercris, **BOLA STEPHEN** was the beneficial owner of Mercris who provided all funds for the purchase of Mercris, operated Mercris day-to-day, and received Mercris's reimbursements from Medicare.

20. Egobundu Koko was a patient recruiter for **BOLA STEPHEN's** HHAs.

**COUNTS ONE TO FOUR**
**Health Care Fraud**
**(18 U.S.C. §§ 1347 and 2)**

21. Paragraphs 1 through 20 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

22. From in or around January 2013, and continuing through in or around April 2020, in the Southern District of Texas, and elsewhere, the Defendant,

**BOLA STEPHEN,**

aiding and abetting and aided and abetted by others known and unknown to the Grand Jury, in connection with the delivery of, and payment for, health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud Medicare, a health care benefit program as defined in Title 18, United States Code, Section 24(b),

and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare, by submitting and causing the submission of false and fraudulent claims to Medicare, for purported items and services that were not medically necessary and not provided as billed.

### Purpose of the Scheme to Defraud

23. It was an object and purpose of the scheme for Defendant **BOLA STEPHEN** and her coconspirators known and unknown to unlawfully enrich themselves by, among other things, submitting and causing the submission of false and fraudulent claims to a health care benefit program, that is, Medicare, for services that were not medically necessary and not provided as billed.

### Manner and Means to Accomplish the Scheme to Defraud

The manner and means by which the Defendant **BOLA STEPHEN** sought to accomplish the scheme to defraud included, among other things, the following:

24. **BOLA STEPHEN** paid patient recruiter Egobundu Koko and other patient recruiters to obtain access to Medicare beneficiaries, including the beneficiaries' personally identifiable information, which was necessary for **BOLA STEPHEN's** HHAs to bill Medicare for purportedly providing home health services to these beneficiaries. The beneficiaries that were the subject of these transactions were generally aware that **BOLA STEPHEN** was claiming to have provided them with home health services and agreed to allow **BOLA STEPHEN** to do so.

25. **BOLA STEPHEN** then either (a) paid purported clinics, such as Milten, for fraudulently signed Form 485s falsely certifying that beneficiaries were homebound and qualified for home health services, and then billed Medicare for home health services that were not medically necessary and not provided; or (b) billed Medicare for home health services as if a

7

physician had signed a Form 485 and authorized the services when, in fact, no physician had done so.

26. **BOLA STEPHEN**, either herself or by directing her employees, falsified and altered documentation that her HHAs were required to maintain, including OASIS forms and Form 485s, to make it appear as though beneficiaries qualified for home health services when they did not, and to make it appear that beneficiaries had more severe health conditions than they did to increase the reimbursement that Medicare would pay to **BOLA STEPHEN's** HHAs.

27. Between in or around September 2016 and in or around March 2017, Medicare revoked Starlite and Libertycare for abusing their billing privileges. Between in or around April 2017 and in or around May 2017, Medicare issued letters seeking recoupment of wrongfully paid reimbursements in an amount of approximately $1.21 million for Libertycare and approximately $1.77 million for Starlite, for a combined total of approximately $2.98 million. **BOLA STEPHEN** did not contest these recoupment letters.

28. Following Medicare's revocation of Starlite and Libertycare, **BOLA STEPHEN** purchased Mercris from Person 1 using Person 2 as the nominee owner. Although Person 2 was listed as the owner of Mercris on Medicare documents and the sale paperwork, **BOLA STEPHEN** provided all the funds for the purchase of Mercris and ran the day-to-day operations for Mercris without Person 2's involvement.

29. Although Mercris received reimbursements from Medicare, all of which went into a bank account controlled solely by **BOLA STEPHEN**, **BOLA STEPHEN** never repaid any of the outstanding recoupments for wrongfully paid reimbursements to Starlite and Libertycare.

30. Over the course of the scheme, which began no later than 2012 and continued through at least 2020, **BOLA STEPHEN's** HHAs were paid over $6.10 million for home health

services. Of this amount, at least $3.34 million were for home health services that were not medically necessary, not provided as billed, or procured through the payments of kickbacks and bribes, including (a) approximately $2.89 million in overpayments detailed in the recoupment letters that **BOLA STEPHEN** did not contest, and (b) approximately $355,807.07 that Medicare paid to Mercris, which Medicare would not have paid if it had known that **BOLA STEPHEN** owned and operated Mercris.

### Executions of the Scheme to Defraud

31. On or about the dates specified below, in the Houston Division of the Southern District of Texas, and elsewhere, the Defendant,

**BOLA STEPHEN,**

aiding and abetting and aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully submit and cause to be submitted the following false and fraudulent claims to Medicare for purported items or services that were not home health services that were not medically necessary, not provided as billed, or procured through the payments of kickbacks and bribes, in an attempt to execute, and in execution of the scheme described in paragraphs 23 through 30, with each execution set forth below forming a separate count:

| Count | Beneficiary | Claim Number | Date Claim Submitted | Approximate Amount Paid |
|---|---|---|---|---|
| 1 | M.B. | *1404TXR | July 9, 2018 | $3,068.53 |
| 2 | H.B. | *0804TXR | November 4, 2019 | $2,317.60 |
| 3 | A.T. | *6604TXR | July 30, 2018 | $2,063.77 |
| 4 | M.T. | *6504TXR | June 13, 2018 | $3,274.90 |

Each in violation of Title 18, United States Code, Sections 1347 and 2.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

32.  Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to Defendant **BOLA STEPHEN**, that, upon conviction of Counts One through Four, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offenses is subject to forfeiture.

### Money Judgment and Substitute Assets

33.  Defendant **BOLA STEPHEN** is notified that upon conviction, a money judgment may be imposed against her.  In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the Defendant up to the amount of the money judgment.

A TRUE BILL

**Original Signature on File**

FOREPERS

JENNIFER B. LOWERY
UNITED STATES ATTORNEY

JOSEPH S. BEEMSTERBOER
ACTING CHIEF, FRAUD SECTION

ANDREW TAMAYO
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE